IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

IN RE: HENRY D. SUTTON, DEBTOR  CASE NO.: 6:10-bk-76701
CHAPTER 13

## MEMORANDUM OPINION AND ORDER

This case involves successive objections by the Chapter 13 Standing Trustee to pre-confirmation amended plans filed by the debtor. Following two evidentiary hearings, two issues remain: (1) whether the principles of res judicata or collateral estoppel prevent the trustee from raising and expanding on an issue that formed the basis of the court's previous ruling sustaining the trustee's objection to confirmation; and (2) if those principles do not, whether the additional facts raised at the second hearing compel a conclusion that creditors would receive more in a chapter 7 liquidation. For the reasons stated below, the court finds: (1) neither res judicata nor collateral estoppel constrict the trustee's arguments or proof at the subsequent hearing; and (2) the trustee's objection to confirmation is overruled. The debtor's plan is confirmed.

### I. Jurisdiction

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rules of Bankruptcy Procedure 9014 and 7052.

1

Entered On Docket: 09/26/2011

## II. Facts

The debtor, Henry D. Sutton ("debtor"), filed his chapter 13 petition on December 30, 2010. (Vol. Petition, Dec. 30, 2010, ECF No. 1.) The debtor's initial plan drew an objection, which resulted in first a *Modification of Chapter 13 Plan* filed on March 16, 2011, as docket entry thirty-five, and then a pre-confirmation *Modification of Chapter 13 Plan* (a pre-confirmation modification) filed on March 18, 2011, as docket entry thirty-nine. Jack W. Gooding, the Standing Chapter 13 Trustee ("trustee"), objected to the March 18, 2011 modification. The trustee's March 30, 2011 objection states in pertinent part:

> 2. 11 U.S.C. 1325(a)(4) creditors would receive greater distribution under a Chapter 7 proceeding. The debtor's schedules reflect the debtor has an ownership interest in a revocable trust having no value. Within 30 days of the bankruptcy filing, the trust had assets including property located at 100 Guy Street, Hot Springs, Arkansas, which the Garland County Assessor's Office valued at $122,850.00, . . . . The debtor sold the property located at 100 Guy Street on November 30, 2010, for less than $50,000.00. The Trustee contends that the sale of property was a fraudulent conveyance because the debtor received less than a reasonably equivalent value for the exchange of the property, which would provide additional funds for the benefit of the unsecured creditors. . . . The debtor's plan proposes to pay a total of $11,100.00, which proceeds would be paid on the Internal Revenue Service claim in the sum of $10,820.95. The debtor has scheduled unsecured claims in excess of $350,000.00, and the propert[y] described above would provide dividends to the unsecured creditors in excess of $140,000.00.

(Obj. to Conf. of Plan as Am. Pre-Conf. on 03/18/2011, Mar. 30, 2011, ECF No. 42.)

At the conclusion of an evidentiary hearing conducted on April 27, 2011, the court sustained the trustee's March 30, 2011 objection. The trustee's principal objection related to the pre-petition sale of a Quonset hut warehouse located 100 Guy Street, Hot Springs, Arkansas (the "Property") for $50,000.00. Pursuant to the court's oral findings, the court entered an *Order Sustaining Objection* that gave the debtor twenty-one days within which to amend his schedules and file an amended plan. (Order Sus. Obj., Apr. 29, 2011, ECF No. 52.) The debtor, on May

17, 2011, filed amended schedules and a *Modification of Chapter 13 Plan* ("Amended Plan") as

docket entry sixty-one.[1] The Amended Plan sought to address the Property as follows:

> THE BALANCE OF THE PROCEEDS FROM THE SALE OF PROPERTY
> LOCATED AT 100 GUY STREET, HOT SPRINGS, AR 71901 IN THE AMOUNT
> OF $40,277.02 HAVE BEEN PAID TO THE TRUSTEE FOR THE BENEFIT OF
> UNSECURED CREDITORS IN THIS CASE.[2]

(Mod. of Ch. 13 Plan, May 17, 2011, ECF No. 61.)

Again, the trustee objected alleging:

> 1. 11 U.S.C. 1325(a)(4) creditors would receive greater distribution under a Chapter
> 7 proceeding. The debtor's schedules reflect the debtor has an ownership interest in
> a revocable trust having no value. Within 30 days of the bankruptcy filing, the trust
> had assets including property located at 100 Guy Street, Hot Springs, Arkansas,
> which the Garland County Assessor's Office valued at $122,850.00. The debtor sold
> the property located at 100 Guy Street on November 30, 2010, for less than
> $50,000.00. The Trustee has obtained an appraisal of the property which values the
> property at $245,000.00. The Trustee contends that the sale of property was a
> fraudulent conveyance because the debtor received less than a reasonably equivalent
> value for the exchange of the property, which would provide additional funds for the
> benefit of the unsecured creditors. The resulting equity would provide additional
> dividends for the benefit of the unsecured creditors.

(Obj. to Conf. of Plan as Amended Pre-Conf. on 5/17/2011, May 25, 2011, ECF No. 64.)

The court conducted a hearing on the Amended Plan on July 20, 2011. At this second

hearing, the trustee introduced evidence of an appraisal in the amount of $245,000.00. The

appraisal was not referenced or introduced at the prior hearing. Accordingly, the debtor

---

[1] The modification is actually an amended plan pre-confirmation, not a modification to a confirmed plan.

[2] The March 16, 2011 *Modification of Chapter 13 Plan* contained similar language, but that language was omitted from the debtor's March 18, 2011 *Modification of Chapter 13 Plan*. The debtor paid this amount to the trustee on April 25, 2011. (Trustee Ex. 4, at 3.)

3

interposed an initial defense that the principles of res judicata and collateral estoppel prevent the trustee from relitigating the value of the Property.

At the first hearing, the court announced its findings of fact and conclusions of law on the record at the conclusion of the hearing. With reference to the debtor's schedules, the court stated, "[t]he disclosures are not full. And I think the [t]rustee is also correct with respect to any potential cause of action concerning the transfer of the warehouse [P]roperty." (Trial Tr. 70, Apr. 27, 2011.) The court made no definitive findings or rulings concerning the actual value of the Property.

Without objection or waiver of its preclusion argument, the debtor, at the July 20, 2011 hearing, introduced the transcript of the April 27, 2011 hearing as it related to the value of the Property.

### A. Value-April 27, 2011 Hearing

The court's review of the transcript from the first hearing reflects that the debtor is seventy-five years old and in relatively poor health. (Trial Tr. 14-16, April 27, 2011.) He is currently unemployed, and Social Security is his sole source of income. (Trial Tr. 14, 25.) Prior to filing his bankruptcy, the debtor transferred the Property to a self-settled revocable trust. (Trial Tr. 20.) The trust then sold the Property on November 30, 2010,[3] to Ronnie Walker ("Walker") for $49,749.25. (Trial Tr. 21, 25-26.) The sale was disclosed on the debtor's initial *Statement of Financial Affairs*, but the proceeds were not reflected in the debtor's initial schedule B concerning equity in the trust. (Trial Tr. 24-26, 48; Trustee Ex. 2, at 6, 23.)

---

[3] The *Statement of Financial Affairs* suggests a date of November 29, 2010. (Trustee Ex. 2 at 23.)

Thereafter, on March 9, 2011, the debtor amended his schedule B to show that the trust had $40,277.02 remaining in its checking account. (Trial Tr. 27-28.) The debtor subsequently tendered this amount to the trustee for distribution to his creditors. (Trial Tr. 28-29.)

The debtor originally purchased the Property as part of a larger twenty-acre parcel of ground with four buildings in 1989. (Trial Tr. 34.) He sold off parcels through the years, including a 1.39-acre tract with one building that he also sold to Walker. (Trial Tr. 34-35.) In 2009, the Garland County Assessor's Office assessed the remaining Property at $122,850.00. (Trial Tr. 34; Trustee Ex. 10, Apr. 27, 2011.)

The Property consists of a Quonset hut suitable for manufacturing or warehousing with limited office space. (Trial Tr. 42.) The debtor has not personally occupied the Property since 1986, although his wife has used the office space on occasion. (Trial Tr. 35.) Since 1986, the debtor has sporadically rented the Property. (Trial Tr. 35.)

The debtor had the Property listed on the market with at least two different realtors for at least five years. (Trial Tr. 35-36.) The debtor initially listed the Property for $299,000.00; a figure he later reduced to $199,000.00. (Trial Tr. 36.) In 2008, the debtor offered the property to Walker for $175,000.00; Walker said no. (Trial Tr. 36, 38-39.) The debtor testified that he had no direct relationship with Walker. (Trial Tr. 38.) Walker owned acreage that adjoined the Property and, over the years, they discussed Walker purchasing the Property. (Trial Tr. 38-39.)

The debtor, after talking with an auctioneer, decided to offer the Property to Walker for $50,000.00. (Trial Tr. 39.) The debtor recognized that the Quonset hut, a corrugated metal building, on the Property was sixty-five years old and that he did not have the money to keep the Property maintained. (Trial Tr. 41.) Thus, he decided to take "bottom dollar for it." (Trial Tr.

5

41.) The debtor described the Property as having a leaky roof with deteriorating timbers within the structure and a deteriorating exterior. (Trial Tr. 42.) Photographs introduced at the hearing confirmed the deterioration. Based on the interior and exterior condition of the Property, the debtor felt like he could not have obtained a higher figure than the sales price to Walker.

At trial, Walker testified that he owned a salvage yard and thought the Property would be "feasible for dry storage[.]" (Trial Tr. 54.) He has, however, incurred significant costs in repairing the roof and tearing out rotten wood. (Trial Tr. 54.) Walker was not interested in the Property when the debtor originally offered it to him at $175,000.00. (Trial Tr. 55.) In 1998, Walker purchased a similar sized Quonset hut from the debtor at public auction for $39,500.00. (Trial Tr. 56.) The similar hut Walker purchased is located approximately 1,500 feet from the Property. (Trial Tr. 56).

Walker further described the Property as having other problems: (1) spray-on insulation that is falling off; (2) the lumber has a musty smell; and (3) the sheetrock is falling off the ceiling and walls. (Trial Tr. 57.) Walker testified that he would need to rip out the sheetrock to restructure. (Trial Tr. 57.) Even with the needed repairs, Walker estimated the current value of the Property at between $50,000.00 and $60,000.00. (Trial Tr. 58.) Walker stated that he paid a fair sales price for the Property. (Trial Tr. 58.) "I didn't run out and try to double my money or anything on it. I haven't—I haven't told anyone I've stole a building; I feel like I paid a reasonable price for it." (Trial Tr. 58.)

### B. Value-July 20, 2011 Hearing

At the second confirmation hearing, held on July 20, 2011, in Hot Springs, Arkansas, the evidence tracked the prior hearing, including the incorporation of the previous hearing's

transcript. However, the second hearing differed from the first in one substantial aspect—the trustee introduced an appraisal ("Appraisal") of the Property prepared by Steve Quast ("Quast"). The Appraisal reflects a final value estimate of $245,000.00.[4] (Trustee Ex. 6, at 2.) Some confusion existed as to the date of inspection, noted as May 21, 2010. (Trustee Ex. 6, at 1.) At trial, Quast testified that May 21, 2011, is the correct inspection date. (Trustee Ex. 6, at 27.)

The trustee did not originate the Appraisal. Rather, Charles Hendrix ("Hendrix") commissioned the Appraisal. (Trustee Ex. 6, at 1.) Hendrix is apparently a creditor of the debtor who, dissatisfied with the sales price to Walker, ordered the Appraisal. Hendrix evidently wanted to know the value of the Property as of the sale date, which he estimated as November 30, 2010. (Trustee Ex. 6, at 1.) Hendrix has not actively participated in the bankruptcy, including the confirmation hearings. The "Intended Use of Report" states that the Appraisal is "to assist the client, Charles Hendrix, in litigation regarding the subject property under appraisement." (Trustee Ex. 6, at 3.) Quast testified that, prior to performing the Appraisal, Hendrix informed Quast that he was unhappy with the sales price/market value of the Property. Additionally, Hendrix asked Quast to do some preliminary research prior to Hendrix ordering the Appraisal. Quast did so and verbally reported a preliminary value to Hendrix reflecting that the Property was worth more than $50,000.00.

On May 21, 2011, Quast inspected the Property. (Trustee Ex. 6, at 3.) Quast inspected only the exterior; he did not inspect the interior. (Trustee Ex. 6, at 2, 4.) Having not inspected the interior of the Property, the Appraisal assumes, "there are no major repairs necessary to

---

[4] The greater value presumably would enure to the benefit of the unsecured creditors, whom the trustee estimated would currently receive an 11% distribution.

properly market." (Trustee Ex. 6, at 2.)  This assumption is completely belied by photographs and credible testimony concerning the interior.  Additionally, Hendrix's instructions significantly diminished the completeness of the Appraisal, with Quast noting, "[i]nspected the subject site and improvements from the exterior only at the client's request; [t]he client, and his attorney, stated that it would be very difficult to obtain inside access due to litigation proceedings[.]"[5]  (Trustee Ex. 6, at 4.)  Quast acknowledged under cross-examination that the exterior was "average" and that a dilapidated interior could substantially affect the value of the Property.  Quast did not contact or have any discussions with Walker.

In appraising the Property, Quast mostly relied on the assessor's records, the size of the Property, and his evaluation of comparable sales in the area with similar locations.  Hendrix specifically requested that Quast not use the cost or income approaches.  (Trustee Ex. 6, at 12.)  Quast concurred, noting that these approaches "would not be given much consideration, if used, due to the age of the improvements."  (Trustee Ex. 6, at 12.)  Quast, accordingly, confined his appraisal to the sales comparison approach.

Quast calculated the Property at 14,410 square feet, resulting in a $17.00 per square foot valuation, including the real estate.  (Trustee Ex. 6, at 22.)  The Appraisal notes that "[t]he [P]roperty has been on the open market for sale in the past 2 years" at $299,500.00 for 1.26 acres.  (Trustee Ex. 6, at 3.)  Quast additionally noted that the Property, comprising 2.66 acres, sold to Walker on November 30, 2010.  (Trustee Ex. 6, at 3.)  Thus, the Appraisal directly conflicts with the debtor's testimony that he had been trying to sell the property for

---

[5] The record does not suggest that the debtor, his counsel, or Walker would have refused an inspection.

approximately five years.  Quast did acknowledge that the debtor's realtor was a large, recognized commercial broker.  Quast also noted that the debtor's broker received no offers while the Property was listed.  Further, and importantly, Quast attached no significance to Walker's previous purchase of a nearby Quonset hut from the debtor in 1998 for approximately $39,000.00.

According to the Appraisal, the Property sits on a very irregularly shaped lot, is zoned for warehousing and wholesaling, has a gravel parking lot with two buildings, which are at least fifty years old, and presumably is without heating or cooling, except for perhaps suspended fans. (Trustee Ex. 6, at 9-11.)

The Appraisal reflects comparables from $14.56 per square foot to a high of $17.77 per square foot, adjusted value.  (Trustee Ex. 6, at 21-22.)  Quast used seven comparable sales. (Trustee Ex. 6, at 21.)  Each comparable is, of course, premised upon an actual transaction. However, none of the comparables suggested an interior condition equivalent to that of the Property.

### III.  Discussion

At trial, the debtor contended that the legal doctrines of res judicata and collateral estoppel precluded the trustee from raising the same objection and relitigating the value of the Property.

In *Katchen v. Landy*, the United States Supreme Court observed, "[t]he normal rules of res judicata and collateral estoppel apply to the decisions of bankruptcy courts."  382 U.S. 323, 334 (1966) (citing *Chicot Cnty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376-77 (1940)).  In analyzing whether res judicata or collateral estoppel applies, the court turns to state

law.  *See Dodson v. Univ. of Ark. for Med. Sci.*, 601 F.3d 750, 760 (8th Cir. 2010) (noting that "Arkansas law governs whether the preclusion doctrines apply []").  In Arkansas, "[r]es judicata bars relitigation of a claim in a subsequent suit when five factors are present." *Powell v. Lane*, 289 S.W.3d 440, 444 (Ark. 2008).  The five res judicata factors detailed in *Powell* include "(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based upon proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies."  *Id.*  (citing *Moon v. Marquez*, 999 S.W.2d 678, 680 (Ark. 1999)).

In contrast to res judicata, the doctrine of collateral estoppel precludes the relitigation of an issue.  To prove collateral estoppel, a party must establish "(1) the issue sought to be precluded [was] the same as that involved in the prior litigation; (2) that issue [was] actually litigated; (3) the issue [was] determined by a valid and final judgment; and (4) the determination [was] essential to the judgment."  *Powell*, 389 S.W.3d at 444 (citing *State Office of Child Support Enforcement v. Willis*, 59 S.W.3d 438, 443 (2001)).

Although the doctrines of res judicata and collateral estoppel are dissimilar in some respects, both doctrines require proof of one common element:  the previous litigation resulted in a final judgment.  Thus, the court's previous ruling, sustaining the trustee's objection, must have resulted in a final judgment to preclude the trustee from litigating his subsequent objection.

Courts have addressed this issue and ruled that "bankruptcy orders denying confirmation of a proposed plan but not dismissing the underlying petition are nonfinal decisions not subject to appeal." *Lewis v. U.S.*, 992 F.2d 767, 772 (8th Cir. 1993) (citations omitted).  *See also*, *Simons v. Fed. Deposit Ins. Co.* (*In re Simons*), 908 F.2d 643, 644-45 (10th Cir. 1990); *Khan v.*

*Bankowski* (*In re Khan*), 375 B.R. 5, 7 (B.A.P. 1st Cir. 2007) (noting that "[a]n order sustaining an objection to plan confirmation is not a final, appealable order"); *Vincent v. Fairbanks Capital Corp.* (*In re Vincent*), 301 B.R. 734, 738 (B.A.P. 8th Cir. 2003) (stating that "the denial of the modification of a confirmed plan bestows no more finality on the bankruptcy court's order than the denial of confirmation of a plan"). Since the court's previous ruling on the trustee's objection did not result in a final judgment, neither res judicata nor collateral estoppel apply to the trustee's objection.

Accordingly, it is appropriate for the court to consider the trustee's objection in the context of 11 U.S.C. § 1325(a)(4), which provides:

> (a) Except as provided in subsection (b), the court shall confirm a plan if —
>   (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date[.]

11 U.S.C. § 1325(a)(4) (2011). "Satisfaction of § 1325(a)(4), which is referred to as the 'best interest of creditors' test,' is a fundamental condition to confirmation. It assures that creditors will be paid, at minimum, the amount which they would be paid if the case was a Chapter 7 liquidation." *In re Coonrod*, 135 B.R. 375, 377 (Bankr. D. Neb. 1991). *See Van Der Heide v. LaBarge,* (*In re Van Der Heide*), 164 F.3d 1183, 1184 (8th Cir. 1999); *Forbes v. Forbes* (*In re Forbes*), 215 B.R. 183, 188-89 (B.A.P. 8th Cir. 1997); *In re Larson*, 245 B.R. 609, 614 (Bankr. D. Minn. 2000); *In re Smith*, 200 B.R. 213, 215 (Bankr. E.D. Mo. 1996).

The trustee contends that the sale of the Property represented a fraudulent conveyance that, if avoided in a chapter 7, would presumably be sold and realize a greater amount for distribution to the unsecured creditors. In that hypothetical analysis, the chapter 7 trustee would

presumably file a fraudulent conveyance action pursuant to 11 U.S.C. § 548(a)(1)(B), which states in pertinent part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> > (B)(I) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> > > (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548 (a)(1)(B)(i)-(ii)(I) (2011).[6]

From the evidence adduced at trial, the court is satisfied that the testimony and exhibits, including the Appraisal, do not and would not in a hypothetical chapter 7 persuasively reflect that the debtor sold the Property for less than reasonably equivalent value. Thus, the transfer, presumably, could not be successfully avoided for the benefit of the unsecured creditors.

The restrictions placed on the appraisal process by Hendrix resulted in an Appraisal that does not meaningfully contradict the actual market value of the Property reflected by the arms-length sale to Walker. Specifically, Quast appraised a warehouse and office facility without inspecting the interior. (Trustee Ex. 6, at 2, 4.) The overwhelming and credible testimony is that the interior was in a significantly deteriorated state. (Trial Tr. 41-42, 57-58.) The debtor had not been using the Property for number of years; the premises simply deteriorated from age, lack of use, and the debtor's admitted inability to maintain the Property. (Trial Tr. 35, 41-42.) The Property is an aged Quonset hut with a gravel parking lot. (Trustee Ex. 6, at 11.) The Property

---

[6] The trustee does not allege that the debtor engaged in actual fraud in the sale of the Property.

is without proper heating and air and is in a dire need for extensive repairs. (Trustee Ex. 6, at 11.) These facts were amply supported by testimony and photographs. As Quast admitted, the state of the interior could have a substantial impact on its value.

The Property had not been gainfully used for a number of years and had been on the market for approximately five years. (Trial Tr. 35-36.) Significantly, the debtor never received a single offer. (Trial Tr. 35-36.) The debtor had, at all times, been a motivated seller represented by established and competent realtors. The record contains no evidence that the sale to Walker was anything other than an arm's-length transaction with an adjoining landowner, a representative of a relatively finite pool of interested parties. Further, Walker was a less-than-willing buyer who finally succumbed to a "bottom dollar" price. (Trial Tr. 41.) The debtor had every reason to sell high and, equally, every reason to have to, in reality, sell low. The court simply cannot conclude that a chapter 7 trustee would be absolutely assured of convincing a court, based on this evidence, that the debtor received less than reasonably equivalent value and that the November 2010 sale represented a fraudulent transfer.

## IV. Conclusion

For the reasons stated herein, the trustee's objection is overruled, and the debtor's Amended Plan is confirmed.

IT IS SO ORDERED.

Dated this 26th day of September, 2011.

                                              RICHARD D. TAYLOR
                                              U.S. BANKRUPTCY JUDGE

cc:    Henry D. Sutton, Debtor
        Marc Honey, Attorney for the Debtor

Jack W. Gooding, Chapter 13 Standing Trustee

14